657 So.2d 341 (1995)
STATE of Louisiana
v.
James W. ELLIS and Wayne Kennair.
No. 94-KA-599.
Court of Appeal of Louisiana, Fifth Circuit.
May 30, 1995.
Rehearing Denied July 17, 1995.
*344 John M. Mamoulides, Dist. Atty., Terry M. Boudreaux, Asst. Dist. Atty., Louise Korns of counsel, Dist. Atty.'s Office, Gretna, for plaintiff/appellee.
Julian R. Murray Jr., Chehardy, Sherman, Ellis, Breslin & Murry, Metairie, for defendant/appellant James W. Ellis.
Bruce G. Whittaker, Indigent Defender Bd., Gretna, for defendant/appellant Wayne Kennair.
*345 Before DUFRESNE, GOTHARD and CANNELLA, JJ.
GOTHARD, Judge.
James Ellis and Wayne Kennair were charged, by bill of information filed on October 18, 1993, with two counts of conspiracy to commit first degree murder in violation of LSA-R.S. 14:26:30. The two charges relate to two separate plots to kill Russell Protti and Leigh Barton. Defendant Ellis was also charged with the crime of being a convicted felon in possession of a firearm in violation of LSA-R.S. 14:95.1. Both defendants were arraigned on November 5, 1993, and pled not guilty to all charges.
Several defense motions were filed on behalf of both defendants. After an adverse ruling on a motion to suppress the evidence, defendant Ellis withdrew his not guilty plea as to count three of the bill of information, felon in possession of a firearm. After being apprised of his rights, he pled guilty as charged to that offense on January 3, 1994 under the holding of State v. Crosby, 338 So.2d 584 (La.1976).
Both defendants were tried by a jury on the remaining counts. At the conclusion of the trial on January 7, 1994, both defendants moved for a mistrial, arguing that the state had not timely turned over certain exculpatory material, pursuant to Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The court denied the motion. The jury found both defendants guilty as charged on both counts of conspiracy to commit first degree murder.
On January 20, 1994, the trial judge sentenced defendant Ellis to thirty years on each count of conspiracy to commit first degree murder. Further, defendant Ellis was sentenced to serve ten years on the charge of being a convicted felon in possession of a firearm, and ordered to pay a $1,000.00 fine. All sentences were made to run consecutively. On the same date, the judge sentenced defendant Kennair to serve thirty years on each one of the two counts of conspiracy to commit first degree murder. These sentences were also made to run consecutively. Kennair's defense counsel filed a motion for new trial, and a motion to reconsider the sentence. The court denied both motions.
The state filed multiple offender bills as to both defendants. The defendants were both arraigned on the multiple bills on January 20, 1994 and pled not guilty. After a hearing on March 18, 1994, the court found defendant Ellis to be a second felony offender and Kennair a fourth felony offender. The judge vacated both defendants' prior sentences. New sentences identical to the prior, vacated sentences were imposed. Motions for appeal filed by both defendants were granted on March 22, 1994.[1]

FACTS
The incidents giving rise to this prosecution were based on a conflict which began in the spring of 1990. At that time James Ellis was in the 29th year of his employment with the Jefferson Parish School System, and was serving as the Director of Adult and Community Education. Dr. Russell Protti was the Superintendent of the Jefferson Parish School Board. Dr. Leigh Barton was the Assistant Superintendent for the Division of Instruction with the School Board as well as Ellis' immediate supervisor.
Dr. Barton received information that led her to recommend that Ellis' employment be terminated. She submitted her recommendation to Barbara Turner, the School Board's Assistant Superintendent for Personnel Relations. The matter was presented to an executive session of the school board at a meeting on May 16, 1990. Afterwards there was a public meeting of the board, at which the Ellis termination was discussed. Ellis was present during the public portion of the meeting, which continued until about midnight, but was not allowed to speak.
As Dr. Protti returned home and drove into his driveway after the meeting, Ellis parked his car on the street so that it blocked the driveway. Dr. Protti remained seated in his car as Ellis approached the front of the vehicle on foot, carrying an object *346 wrapped in a towel. Ellis removed the towel to reveal a gun, which he pointed at Dr. Protti's head. Ellis pulled the trigger, but the gun failed to fire. Ellis then ejected the shell and attempted to load another one. At that point Dr. Protti fled the scene in his car, knocking Ellis to the ground. A spent cartridge found in Dr. Protti's yard was matched to Ellis' gun through police tests.
As a result of this incident, James Ellis was charged with attempted second degree murder. He pled guilty as charged and was sentenced to serve ten years at hard labor. Nine years of the sentence were suspended and Ellis was ordered to serve the remaining year. Of that year, he served only six months at the Jefferson Parish Prison and was then placed on probation.
The investigation leading up to the prosecution herein began on September 10, 1993, when several law enforcement officers met at the Investigations Bureau of the Jefferson Parish Sheriff's Office. Those officers included Lieutenant Daniel Samrow, Assistant Commander of the Jefferson Parish Sheriff's Department's Intelligence Division, Lieutenant John Thevenot of the Sheriff's Department's Narcotics Division, Chief Gene Fields of the Sheriff's Department, and United States Customs Agents, Mike Dearie and Ryan DiStefano. Also at the meeting was Robert "Rocky" Richard, a confidential informant who had previously worked with law enforcement agencies such as the United States Customs Service.[2]
Richard told the officers that on or about September 4, 1993, he had been approached by defendant Wayne Kennair, an acquaintance of about twenty years, who lived in Richard's apartment building at 433 Friscoville in Arabi, Louisiana. Kennair wished to hire Richard on behalf of an unnamed "solicitor" to murder three individuals; one man and two women. Kennair did not name the potential victims, but told Richard that they were co-workers of the solicitor at either the Jefferson Parish School Board or Police Jury. Richard later learned from Kennair that these individuals had caused the solicitor to be fired and incarcerated.
Based on Richard's information, the officers surmised that the solicitor was James Ellis, and the potential victims were Dr. Protti, Dr. Barton and Ms. Turner. The investigating officers discovered that Ellis and Kennair had for a time been assigned to the same group of cells, or "pod", in prison. The officers further uncovered four money orders Ellis had sent to Kennair totalling $175.00. The return address given on the money orders was 400 20th Street, Apartment 11, in Gretna, the home of Ellis' secretary, Susan Guccione.
The potential victims were assigned twenty-four hour security, and the two suspects, Ellis and Kennair, were placed under regular surveillance. To accomplish this, the Jefferson Parish Sheriff's Department immediately set up a surveillance team, headed by Lt. Thevenot. Richard agreed to participate in the investigation as a confidential informant, and was financially compensated for his services. He was thereafter given daily instructions by the officers.
At the request of the surveillance team, Richard set up a meeting with Kennair on the afternoon of September 10th. Richard was equipped with a listening device, which he concealed on his person. At the meeting, which took place in front of Kennair's apartment building, Kennair revealed that their first target would be a woman. The killing was to take place somewhere between her home on Judy Street in River Ridge, and her place of employment on the West Bank. The plan was for Richard to bump her car and then shoot her when she got out to investigate the accident. Kennair told Richard he would be paid two thousand dollars for his services. Officers learned that Dr. Barton had once lived at the Judy Street address given to Richard, but that she had recently moved.
After the meeting with Kennair, Richard turned a microcassette tape over to Lt. Samrow and gave the officers a report of his conversation with Kennair. Due to an equipment malfunction, nothing could be discerned on the tapes.
*347 Based on the information gathered up to that point, the officers obtained a court order to install pin registers on Ellis' telephone and on the telephone registered to Susan Metzler, the woman with whom Kennair was living.[3] The pin registers were set up on September 14, 1993. The register documented three telephone calls from Ellis' telephone to Metzler's, one each on September 14, 21, and 24. Wiretaps were placed on Ellis' two telephone lines on September 23, 1993.
On September 16, 1993 Richard again met with Kennair in the parking lot of his Friscoville Street apartment building. Richard met with officers beforehand and was again equipped with a listening device. Sheriff's department deputies also recorded the meeting on video. During that meeting Kennair disclosed the solicitor's address and said he would be talking to the solicitor that night. Richard passed this information on to sheriff's deputies.
Richard's next encounter with Kennair was on the evening of September 21, 1993, at which time they discussed details of the murder plan. Kennair stated that the crime was to be committed with a .22 caliber shotgun. The two also discussed the various cars that might be used in committing the crime. Kennair increased his offer of payment to three thousand dollars. During this meeting Kennair gave Richard a piece of paper on which was written the name Leigh Barton, a telephone number and the address 10025 Judy Street in River Ridge.[4] (The word Ridge was misspelled on the paper.)
Immediately after the meeting Richard met with Sergeant Tim Miller of the Jefferson Parish Sheriff's Department and gave him the microcassette tape and the piece of paper. Sgt. Miller took the evidence directly to the office, where he locked it in the safe overnight and then turned it over to Lt. Samrow the following morning.
Richard met with Kennair again on September 23rd. Kennair stated that he would ask the solicitor for money so that they could buy disguises (i.e., glasses, wigs) to wear while committing the murder. The two also discussed different ways in which they might commit the crime.
On the morning of September 24, 1993, officers monitored a telephone conversation, via the wiretap, which led them to set up a surveillance at the McDonald's Restaurant at Franklin and St. Claude Avenues in New Orleans. Deputy Barrett Morton of the Jefferson Parish Sheriff's Office was stationed inside the restaurant to observe. At about 10:30 a.m., Ellis and Kennair met in the restaurant's parking lot. The two men talked inside of Kennair's car for a short time. Ellis then exited the car and both men left the scene. The meeting was recorded on video by sheriff's deputies.
Sheriff's deputies installed video and audio equipment in Richard's car, a Chevrolet Camaro, on September 24th, in anticipation of his next meeting with Kennair. Richard was again supplied with additional audio equipment to wear concealed on his person. Richard picked up Kennair that afternoon and drove to Judy Street in River Ridge on the pretext of locating their prospective victim's house. They were followed by a police surveillance vehicle.
While the two rode in the car they discussed the murder plan. Kennair stated that the solicitor wanted the targeted individuals killed because they had caused him to lose his job and go to jail. The two men located the residence at 10025 Judy Street and drove by twice. The tapes made of this meeting were handed over to the sheriff's office.
On September 25th, the two men met again. They discussed a possible alibi for the solicitor. Then over the next several days Richard tried to convince Kennair to go back to Judy Street.
*348 On September 26, 1993, Lt. Thevenot spoke with the current resident of 10025 Judy Street. She was concerned about a man who had driven past her house several times, staring at her while she mowed her lawn. The descriptions she gave of the man and his car were unfamiliar to Lt. Thevenot, and he became concerned that there was another unknown person involved in the conspiracy. Concerned for the safety of the intended victims and the new resident of the Judy Street address, Thevenot decided the time had come to act on the information gleaned in the investigation.
On the morning of September 28, 1993, the Sheriff's department again equipped Richard's car with a video camera and Richard was "wired" with audio equipment. Lt. Samrow established a surveillance at 10025 Judy Street. Deputy Jolynn Cummings, who is of the same general physical build as Dr. Barton, was assigned to portray Barton that day. Deputy Cummings obtained Dr. Barton's automobile (a Toyota Camry), and parked it in the driveway of the Judy Street residence. In the car with Cummings was Deputy Aaron Wilkie, who maintained radio communications with the surveillance officers.
Richard and Kennair planned to go to Judy Street that morning and follow Dr. Barton to work at the Jefferson Parish School Board. Their objective, Richard told Kennair, was to become familiar with the route Barton took each day since they would commit the murder along this route. Richard and Kennair left the Friscoville Street apartment in Richard's car and headed toward Judy Street.
Later Deputy Cummings saw Richard's car pass down Judy Street. She was instructed over the police radio to proceed on the planned route, expecting Richard and Kennair to follow. However, Richard became lost and did not follow as planned. Since Richard knew where the school board building was located, he went directly there.
At about 7:00 a.m. Richard and Kennair arrived at the school board building on Manhattan Boulevard. They passed through the parking lot twice without stopping. As they passed through a third time, Deputy Cummings arrived and parked in Dr. Barton's assigned space. The surveillance officers then moved in and placed Kennair under arrest.
Upon his arrest Kennair agreed to cooperate with authorities to bring about the arrest of James Ellis. Lt. Samrow set up a telephone call that day between Kennair and Ellis. During that call Ellis agreed to meet Kennair at the parking lot of Mervyn's Department Store at Oakwood Shopping Center in Gretna. The Sheriff's department set up a video surveillance at the Mervyn's parking lot. Officers also "wired" Kennair with audio taping equipment. They instructed Kennair that he was to ask Ellis for one hundred dollars to cover expenses incurred in carrying out the murder.
Agent Joe Williams, who was assigned to follow Ellis that day, saw Ellis leave his home at 136 Cottonwood Street at about 8:30 a.m. on September 28th. Ellis got into his car, accompanied by his secretary, Ms. Guccione. The defendant drove to the Whitney Bank on Terry Parkway and completed a transaction at the drive-through teller before proceeding to Mervyn's, where he met Kennair in the parking lot at about 9:30 a.m.. Their conversation was monitored from inside a surveillance van by Sergeant Monnerjahn, Major Soto, and Lt. Samrow. Officers searched Kennair's car and person for money prior to the meeting, and found none.
The audio tape of the meeting between Kennair and Ellis was transcribed and admitted at trial. A portion of that transcript reads as follows:
KENNAIR: ... I told you the best thing I'm a do, I'm going to do right there by her.
ELLIS: By where?
KENNAIR: By that house.
ELLIS: By, by her house?
KENNAIR: Yea.
ELLIS: Oh, I think so.
KENNAIR: Yea, because it's quieter over there in the morning right there, you know.
ELLIS: Okay, so, so it'd be early in the morning?
KENNAIR: Yea, probably so, yea, um ...

*349 ELLIS: That'd be fine.
KENNAIR: Also um, now um, I'm a get out of town for about a week.
ELLIS: Okay, can you, can you call me back and let me know and I'll have the money for you.
KENNAIR: Well, I'd like to get paid before I go out of town.
ELLIS: Okay, that's fine.
KENNAIR: Uh?
ELLIS: That's fine.
KENNAIR: Now, how we gonna do that? You know, like ...
ELLIS: Okay, you, so in other words, you, you gonna leave the same day you do it?
KENNAIR: Yea, if possible.
ELLIS: You know, you uh, I can meet you sometime, you know, if it happens, you know, they gonna be all over me, they probably gonna (Inaudible) come see where I am, too....
KENNAIR: And then when I come back then if you want to uh, see about that other thing? You know the first one?
ELLIS: Protti? Well, maybe we let it lay for six months or so and then take a shot at it cause, you know, if, if, if these people start dying off too quick, they're definitely gonna be looking for me.
KENNAIR: Alright....
After the meeting was concluded, the officers allowed Ellis to leave the scene. The officers searched Kennair and found five twenty dollar bills. Surveillance officers were then instructed to apprehend Ellis. Four officers travelling in three unmarked police units pursued Ellis' car, utilizing their dashboard police lights and sirens to get defendant's attention. The pursuing officers were finally able to stop defendant on Whitney Avenue in Orleans Parish by surrounding his car with their police units. Ellis was placed under arrest. At that time Ms. Guccione was still in Ellis' car. The arresting officers seized a gun they found in Ellis' car.
Upon his arrest, Ellis was transported to the investigations bureau of the Sheriff's Office. Lt. Samrow apprised Ellis of his rights and then Ellis gave a tape recorded statement. Lt. Samrow then assisted in taking a statement from defendant Kennair.
At trial, Ellis testified that he had met Kennair when they were both inmates in prison, and that Kennair had helped him adjust to prison life. Later, when Ellis was released, he repaid what he saw as an obligation to Kennair by sending him money.
Ellis further testified that when Kennair was released from jail the two maintained communications. Kennair went to Ellis asking for money for groceries and gasoline. In exchange, Kennair suggested that he could kill Dr. Protti or Dr. Barton. Ellis testified that he did not believe Kennair was serious in his suggestion.
After Kennair's release from jail, Ellis gave him a total of about $250 to $300. Ellis testified that he thinks Kennair suggested the murders because it was customary in jail not to ask a favor of someone without offering something in return. Thus, whenever Kennair mentioned his scheme for committing the murders, Ellis pretended to go along with it, never believing that Kennair was serious in his intent.
Ellis testified that he did not intend to shoot Dr. Protti in May, 1990; he merely meant to frighten him. He did not attempt to fire the gun, nor did the gun misfire. He put the safety on and pretended to pull the trigger. Then he pretended to reload the weapon to further frighten Dr. Protti[5]. Ellis testified that he pled guilty to attempted murder because his attorney advised him to accept a favorable plea bargain.
Wayne Kennair testified that he had been convicted of manslaughter in 1975, felon in possession of a weapon in 1983, simple burglary of an inhabited dwelling in 1986 and simple burglary in 1990. He talked to Ellis every day when the two were assigned to the same pod in prison. Ellis talked about Russell *350 Protti once, saying he would "like to have somebody take care of that."
Kennair testified that when he was released from prison, he used the murder scheme as a means of getting money from Ellis, but he never seriously planned to commit the murders. Once Richard was involved in the plot, Kennair was afraid to end it because he knew Richard to be a dangerous and violent man.

ASSIGNMENTS OF ERROR, DEFENDANT ELLIS
On appeal each defendant assigned trial errors. We will address those of defendant Ellis first. Ellis assigns eleven errors which he condenses into six arguments. After making an initial statement of introduction, Ellis asserts that the trial court erred in allowing the prosecution to admit hearsay statements made by co-conspirators to establish a prima facie case of conspiracy against Ellis. Further, Ellis argues the court erred in finding that the state established a prima facie case of conspiracy, and in admitting the statements into evidence at trial based on that finding.
On January 4, 1994 prior to the commencement of trial, the court conducted a hearing out of the jury's presence to allow the state to lay the proper predicate for the introduction of co-conspirators' statements pursuant to LSE-C.E. article 801(D)(3)(b). Counsel for defendant Ellis objected to the introduction by the state of the co-conspirators' statements at the hearing. Counsel argued that statements made by co-conspirators may not be considered by the trial court in making its determination as to whether a prima facie case of conspiracy has been established. The defendant reiterates that argument on appeal. It is the defendant's position that a prima facie case of conspiracy must be shown before the hearsay statements can be used, and the consideration of the hearsay to establish the conspiracy is impermissable "bootstrapping", prohibited by the Louisiana Code of Evidence.
Article 802 of the Louisiana Code of Evidence prohibits the admission of hearsay except "as otherwise provided by this Code or other legislation." Article 801(D)(3)(b) of the Louisiana Code of Evidence makes the statements of co-conspirators nonhearsay, but provides that in order for such statements to be introduced into evidence, a prima facie case of conspiracy must first be established.[6]
The state argued that the contested statements were admissible under the holding in State v. Myers, 545 So.2d 981 (La.1989). The trial judge agreed with the state's argument and allowed the challenged evidence to be admitted.
The two defendants in Myers were charged with conspiracy to commit murder, and second degree murder of Myers' wife. The state informed the defendants of its intention to use, at trial, the statements the two had made to law enforcement officials. A hearing was held at which the state attempted to present a prima facie case of conspiracy pursuant to the old version of LSA-R.S. 15:455.[7] The only evidence the state offered at this hearing was the testimony of two police officers as to the contents of the defendants' statements. At the conclusion of the hearing, the trial judge found that the state had failed to present a prima facie case of conspiracy, and therefore the statements were not admissible at trial. The *351 Supreme Court affirmed the ruling of the trial court.
The Myers court reviewed the question of whether the trial court may consider the statements of co-conspirators when determining the establishment of a prima facie case. The court decided that the new Code of Evidence, and specifically C.E. art. 104(A)[8], did allow this. State v. Myers, 545 So.2d at 985. Counsel for defendant argues herein that this was merely dicta, and therefore, should not be considered binding authority. We do not agree. Defendant's argument fails to take into account the Supreme Court's more recent holding in State v. Lobato, 603 So.2d 739 (La.1992). Citing State v. Myers as authority, the court held in Lobato, at 746:
Statements made by co-conspirators which are the object of defense counsel's hearsay objection may be considered by the trial court in making its determination as to whether a prima facie case of conspiracy has been established. (Citation omitted).
Given the foregoing holdings, we find no error in the admission of the hearsay statements into evidence at the pre-trial hearing, and we find no merit in this argument.
Defendant's counsel further argues the trial court erred in finding that the state met its burden of presenting a prima facie case of conspiracy, and thus improperly allowed the co-conspirator's statements to be admitted at trial. A prima facie case is presented, so as to allow hearsay statements of the co-conspirator to be introduced into evidence, when the state introduces evidence which, if unrebutted, would be sufficient to establish the facts of conspiracy.[9]State v. Lobato, supra.
After the state presents a prima facie case of conspiracy, the burden of proof shifts to the defendant to show that he withdrew from the conspiracy prior to the time the statements were made by his co-conspirator. To prove withdrawal, the defendant must show affirmative actions by him which are inconsistent with the object of the conspiracy. State v. Lobato, supra, 603 So.2d at 746. Such affirmative actions include confession to the authorities as well as notification to co-conspirators of abandonment or withdrawal. Id.
In the instant case, the evidence the state presented to prove the admissibility of the hearsay statements was substantially greater than was the case in State v. Myers, supra. The state offered the testimony of Lt. Daniel Samrow, who had extensive and intimate knowledge of the entire police investigation leading up to Ellis' arrest. The state also offered transcripts of video and audio recordings of discussions between the co-conspirator Kennair and the confidential informant "Rocky" Richard, during which the two discussed murder plans in detail. The most telling evidence, as far as Ellis' case is concerned, was the transcript of the recording of Ellis' meeting with Kennair on September 28, 1993. The two openly discussed the plot to murder Dr. Barton and Dr. Protti, and their plans to accomplish that objective.
The Supreme Court in State v. Lobato, supra, 603 So.2d at 739, found that:
The standard for determining the admissibility of statements made by co-conspirators is less than that required to convict a defendant of conspiracy to commit an offense. Such statements, if admissible, only constitute evidence which the jury may consider in reaching its conclusion as to whether a defendant did or did not unlawfully participate in a conspiracy to commit an offense beyond a reasonable doubt. Accordingly, *352 a trial court's determination as to the admissibility of such evidence, i.e., whether the state has made a prima facie showing of a conspiracy and whether a defendant has sufficiently proven withdrawal so as to make his co-conspirators' statements admissible or inadmissible under LSA-C.E. Art. 801(D)(3)(b), will not be overturned absent clear error. (Citations omitted).
The state provided sufficient evidence to show a prima facie case of conspiracy. This evidence was not rebutted by the defendant by the means set forth in State v. Lobato, supra. This assignment of error is meritless.
In his next argument defendant questions the trial court's decision on the admission of certain audio and video tapes generated in the course of the investigation into this matter. The first set of tapes questioned by Ellis consists of audio and video tapes of the conversation between Kennair and himself, recorded on September 28, 1993. He asserts the admission of those tapes was prejudicial, since the evidence was repetitious and cumulative.
At trial, Lt. Daniel Samrow testified that he and other officers conducted a surveillance of the meeting between defendants Kennair and Ellis in the parking lot at Mervyn's Department Store on September 28th. Kennair was equipped with concealed tape recording equipment, so that the meeting was captured on audio tape. The officers also recorded this meeting on video tape. At trial Lt. Samrow testified that it was an accurate depiction of the meeting between Kennair and Ellis, and the audio cassette was introduced into evidence.
Lt. Samrow also identified State's Exhibit No. 12 as the video tape recording of the meeting in Mervyn's parking lot. He stated that, to the best of his knowledge, the tape was an accurate depiction of this meeting. Lt. Samrow further testified that the audio portion of the video tape contained a good deal of background noise and static, but that the conversation was understandable if one listened closely. Samrow explained that the audio recording made with the equipment worn by Kennair was intended as a backup to the video recording.
Ellis' attorney objected to the state playing both recordings for the jury, arguing that it would be repetitious, and thus prejudicial. Counsel suggested that the state play the video tape without the sound, and then play the audio tape. The state argued that the evidence was not cumulative, because the audio tape contained conversation between Kennair and Major Soto of the Sheriff's Department not contained on the video tape. The state further argued that the audio portion of the video tape was not distinct enough to be transcribed, whereas the audio tape had been transcribed for the jury's benefit.
The trial judge allowed both tapes to be played for the jury. The jurors were supplied with a transcript of the audio tape so they could follow along as the tape was played. While playing the tapes for the jury, the prosecutor apparently played the video tape in its entirety, but "fast-forwarded" through segments of "dead air" on the audio tape.
Louisiana Code of Evidence, Article 403, provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
The Louisiana Supreme Court has held that "[i]n weighing the relative probative value of proffered evidence against its probable prejudicial effect, whether the evidence is merely cumulative is a factor to be considered." State v. Tonubbee, 420 So.2d 126, 133 (La.1982), cert. denied, 460 U.S. 1081, 103 S.Ct. 1768, 76 L.Ed.2d 342 (1983), (citing State v. Manieri, 378 So.2d 931, 933 (La. 1979)). The tapes at issue herein are certainly relevant to show intent of both defendants, as well as furtherance of the conspiracy. The conversation between Kennair and Ellis on September 28th is perhaps the most persuasive evidence against Ellis.
The tapes at issue are, to an extent, repetitive. However, both tapes were relevant; the video tape to show identity, as well as the *353 defendants' actions, and the audio tape to show what was said in furtherance of the conspiracy. More than one source of proof on a single issue is neither illegal nor unusual in a jury trial. For instance, where there are two eyewitnesses to a crime, there is nothing in the law to prevent both witnesses from testifying to the same facts merely because their testimony will overlap. At trial in the instant case, several police officers testified to the facts surrounding their investigation of defendants. Much of this testimony was repetitive, though not unfairly prejudicial to defendants.
It is evidence that is highly prejudicial or inflammatory, (such as a gruesome photograph whose inflammatory effect outweighs its probative value), that is generally considered "cumulative" by the courts. See, State v. Tonubbee, supra. Although the defendant complains that he has been prejudiced by the court's admission of both tapes, he does not show how he was prejudiced. We see no indication that admission of the tapes misled the jury, caused undue delay or confusion of the issues, or led to unfair prejudice.
The questions of relevancy and admissibility are within the wide discretion of the trial judge. His determinations regarding relevancy and admissibility should not be overturned absent a clear abuse of discretion. State v. Mosby, 595 So.2d 1135 (La.1992); State v. Mayeaux, 570 So.2d 185 (La.App. 5th Cir.1990), writ denied, 575 So.2d 386 (La.1991). We find no abuse of that discretion in the admission of the tapes in question.
Defendant also objects to the admission of an audio tape of a conversation between Kennair and Rocky Richard recorded on September 24, 1993, on the basis that the tape was of such poor quality that its admission is prejudicial.
On the tape is a recording of Kennair's conversation with Richard as they drove to Judy Street on September 24, 1993. This Court has listened to the tapes. Although there is some background noise on the tape, and some words are not discernable, the conversation is, for the most part, understandable. Furthermore, the tape was transcribed and the transcript was admitted at trial. There is little chance that the jury was confused by the tape, since both conversants, Rocky Richard and Wayne Kennair, testified at trial.
Defense counsel concedes in his brief that any error that resulted from the admission of the video tape of Rocky Richard and Wayne Kennair recorded on September 16, 1993, was rendered harmless because Richard was ultimately called as a witness at trial. Thus, the admissibility of that tape will not be considered by this Court. This assignment of error is without merit.
In his third argument Ellis asserts that the trial court erred in allowing him to be cross-examined regarding his false statement on a passport application. Defendant argues that such evidence is prohibited by the Louisiana Code of Evidence, and that its wrongful admission at trial resulted in confusion and prejudiced his case.
Louisiana Code of Evidence article 607(A) provides: "The credibility of a witness may be attacked by any party, including the party calling him." Article 607(C) permits a party to attack the credibility of a witness by examining him "concerning any matter having a reasonable tendency to disprove the truthfulness or accuracy of his testimony". This grant is subject to the relevancy constraints set forth in La.C.E. art. 403[10], and is limited in scope by La.C.E. art. 608(B).[11]State v. Meshell, 567 So.2d 1181 (La.App. 3 Cir.1990), writ denied, 572 So.2d 87 (La.1991).
In State v. Meshell, supra, the state attempted to discredit a defense witness' testimony by questioning her about her alleged filing of a false police report in an unrelated matter. The witness denied the allegation, and the state offered the testimony of the *354 police officer to whom she had allegedly confessed that she filed the false report. On review, the court of appeal held that the evidence in controversy was only marginally relevant, and posed a great danger of prejudice and confusion of the issues. The court found, however, that the introduction of the evidence did not constitute reversible error. The court reasoned that the evidence erroneously admitted did not bear directly upon the guilt or innocence of the defendant, but attacked the credibility of the witness. State v. Meshell, supra, 567 So.2d at 1185.
The evidence of which defendant complains was introduced during the state's cross-examination of defendant Ellis as follows:
BY MR. GRACIANETTE (prosecutor):
Q. Mr. Ellis, I direct your attention to August of 1992. I show you this document that I've previously marked as State's Exhibit Number 26.
A. Yes, sir.
Q. Do you see your signature on that document?
A. Yes, sir.
Q. Okay. Did you sign that document?
A. Yes, sir. I did.
Q. Okay. Does that document require the swearing of any matters under oath by you?
A. I'm not sure.
Q. Okay. Let me direct your attention to Line 21. Would you read that please? And the language underneath it?
A. All right. (Reading) "Do you sign the"
Q. No. No. Read it to yourself.
A. I can't. It's got a stamp across it.
Q. Do the best job you can.
A. (Witness complies) All right. So thatyeah. Okay. It says, "I solemnly swear ..." That's something I didn't read.
Q. Now I will ask you another question.
A. Yes, sir.
Q. In August of 1992, did you sign that document swearing under oath that the information contained in that document was true and correct?
A. Yes, I did.
Q. Was the information in that document true and correct?
A. No, it wasn't.
Q. So when you testified earlier that you have never lied under oath rather than the August 20, 1990 proceeding in front of Judge Grefer, were you mistaken or were you lying then?
A. I was mistaken. I didn't take this to be an oath.
The evidence at issue herein does not constitute a conviction, but a prior "bad act", inadmissible under La.C.E. art. 608(B) as a means of attacking a witness' character for truthfulness. The trial court clearly erred in allowing the falsified passport application to be admitted as evidence. It is well settled, however, that a reviewing court may declare the erroneous admission of evidence to have been harmless if the state establishes beyond a reasonable doubt that the error complained of did not contribute to the verdict. State v. Smith, 554 So.2d 676 (La.1989).
In the instant case, evidence of the falsified passport application was not used to show Ellis' guilt, but rather his propensity for lying under oath. Ellis had already testified that he lied under oath to obtain a favorable plea bargain offered by the state when he pled guilty to attempted murder in 1990. It is therefore doubtful that the jury was substantially prejudiced by the evidence that he made false statements on a passport application. Further, given the considerable evidence presented against the defendant, we do not find that the improper admission of the passport falsification evidence contributed to the jury's verdict. This argument is without merit.
In his next argument, defendant Ellis argues that the trial court erred in refusing to allow a prosecution witness to be cross-examined regarding his credibility as an alleged hired killer.
At trial Rocky Richard, who testified for the state, gave extensive testimony to the effect that defendant Kennair seriously, and on several occasions, solicited his services as a hired killer on behalf of an unknown person. On cross-examination, Ellis' attorney *355 asked Richard whether he had ever killed anyone. The state objected to the line of questioning, and the court sustained the objection. Defendant argues that the cross-examination should have been allowed to prove the defense theory that Richard's testimony was incredulous. Further, the defendant argues that, "he had a right to pursue that line of questioning because it was factually related to what the state had brought out in direct examination."
Defendant contends that, because his position at trial was that neither he nor Kennair was serious in their scheming to kill Dr. Barton and Dr. Protti, Richard's credibility as a hired killer was crucial to his defense. However, defendant concedes that even if this Court were to find that the trial court erred in disallowing this line of questioning, such error would be subject to harmless error analysis. Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); State v. Sherman, 630 So.2d 321 (La. App. 5th Cir.1993). This Court held in Sherman, 630 So.2d at 324-5, that:
The correct inquiry is whether assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material pints, the extent of the cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. (Citations omitted).
The cross-examiner is permitted to test the accuracy of the witness' memory and perceptions, but to also impeach, i.e., discredit, a witness. La.C.E. art. 607(C); State ex rel. Nicholas v. State, 520 So.2d 377 (La. 1988). However, as discussed in the previous argument, article 607(C) is limited in scope by La.C.E. art. 608(B). Official Comment (b) accompanying this article provides that "... this paragraph follows Louisiana's traditional approach by also prohibiting cross-examination of a witness as to specific instances of conduct (including vices or courses of conduct)".
Counsel was prohibited under La. C.E. art. 608(B) from questioning Richard about prior "bad acts". Furthermore, the extent of questioning on cross-examination is subject to the discretion of the trial judge to limit repetitive or harassing interrogation. State ex rel. Nicholas v. State, supra, 520 So.2d at 380.
Counsel was allowed to extensively and effectively cross-examine Mr. Richard. Before the state objected to counsel's question, Mr. Richard answered that he had never killed anyone. Counsel then went on to ask Richard whether he had ever told Kennair that he had killed someone. Richard responded that he had not. It should also be noted that Richard testified regarding his entire record of criminal convictions during direct examination by the state. The defense was thus able, at least to some extent, to get its point across regarding Richard's credibility as a hired killer. For these reasons we find no merit in this argument.
The defendant next argues that the trial court erred in denying a defense motion for mistrial based on the state's failure to advise the defense of certain exculpatory evidence until the last day of trial, despite the fact that defendant had previously filed a motion requesting such evidence.
The defendant complains that he was prejudiced by the state's failure to turn over exculpatory evidence, namely the transcript of a statement made to police by confidential informant Arthur Hardeman, until the last day of trial. Arthur Hardeman was a confidential informant who lived in the same Arabi apartment building as did Kennair and Richard. He gave a transcribed statement to police some weeks after Kennair and Ellis were arrested.
The disputed statement was described at trial as an interview of Mr. Hardeman by Lt. Samrow of the Sheriff's Department which took place on October 26, 1993. It was eight pages in length. During a bench conference, *356 the prosecutor informed the trial court that the statement contained testimony to the effect that "... Mr. Kennair had told the C.I. that he was initially scamming Mr. Ellis, but then later said that it had gone too far, and he'd have to go through with it." Both defendants had filed pretrial motions asking the state to turn over all Brady material. The state did not disclose the Hardeman statement prior to trial. Apparently the state had initially intended to call Mr. Hardeman as a witness, but in the end decided against it.
Due process requires that the state provide defendant with any exculpatory evidence in its possession which is material to defendant's guilt or punishment, regardless of the good faith or bad faith of the prosecutor. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); State v. Johnson, 426 So.2d 95 (La.1983); see also La. C.Cr.P. art. 718. The Brady rule does not require that the prosecutor disclose his entire file to defendant, but only the evidence favorable to the accused that, if suppressed, would deprive defendant of a fair trial. United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The state must disclose the exculpatory evidence at such time as to allow the defense to use the material effectively in the presentation of its case. State v. Prudholm, 446 So.2d 729 (La. 1984).
While cross-examining defendant Kennair on January 7, 1994, the last day of trial, the prosecutor made reference to Kennair's association with Hardeman, and to parts of Hardeman's statement to police. The pertinent testimony is as follows:
Q.... And do you remember, Mr. Kennair, having conversations with Mr. Hardeman about this scam that you were planning on running on Mr. Ellis?
A. Yes, ma'am.
Q. So you told Mr. Hardeman about that?
A. Yes ma'am.
Q. And you told Mr. Hardeman that you could make a lot of money, didn't you?
A. No ma'am. I never told him that.
Q. Huh?
A. No, ma'am.
Q. And you didn't tell Mr. Hardeman that Jimmy Ellis wanted you to kill somebody who was responsible for having him locked up?
A. I don't believe I used them exact words. I told Norman that I was running a scam on Jim.
Q. And you told Mr. Hardeman that you got in so deep, didn't you, Mr. Kennair, that you had to actually do the killing, didn't you?
A. No, ma'am. I wasn't in deep. I was never in deep. I never had no intentions of doing it, so how could I get in deep?
Q. So, Mr. Kennair, your position today is that you never told Albert (sic) Hardeman that you were going to have to go ahead and kill the people; is that right? You never told him that?
A. No, ma'am.
Q. So if Mr. Hardeman testified to that, he would be lying?
A. Yes, ma'am.
After Mr. Kennair's testimony the court called a recess. During the recess, the state apparently gave Kennair's attorney a copy of the Hardeman statement, and offered to make Hardeman available to the defense as a witness[12]. While the jury was out, the following discussion ensued:
MR. GRACIANETTE (prosecutor):
We had previously disclosed to the defense attorneys information from a confidential informant indicating that Mr. Kennair had told the C.I. that he was initially scamming Mr. Ellis, but then later said that it had gone too far, and he'd have to go through with it. Today, well, previous to this point, also I've disclosed to Mr. Biri [Kennair's attorney] and I thought I disclosed to Mr. *357 Julian Murray [Ellis' attorney] the rap sheet of Arthur Hardeman. For purposes of protecting the record, I disclosed to Mr. Julian and Mr. Biri again the rap sheet of Arthur Hardeman, and I also disclosed to them a copy of the statement to the police for purposes of discussing that conversation.
MR. MURRAY:
That's correct, Your Honor. We got that at the recess.
MR. BIRI:
That's correct, Your Honor.
There was no objection made at that time to the state's failure to timely disclose the Hardeman statement. Later the same day, after the state had concluded its case in rebuttal, both defendants moved for a mistrial. Mr. Biri, Kennair's attorney, argued that the Hardeman transcript was exculpatory evidence under Brady, since it supported defendants' testimony that they had never been serious about killing Leigh Barton and Russell Protti. Because the state had failed to disclose this evidence until the afternoon of the last day of trial, counsel argued that his ability to utilize this evidence was severely impaired. It was further argued that, because the transcript was turned over at such a late date, defense counsel was deprived of the opportunity to interview Mr. Hardeman prior to trial. Ellis' attorney joined in Mr. Biri's argument, adding that the state unfairly alluded to Mr. Hardeman's statement while cross-examining Kennair when defense counsel were not privy to Hardeman's statement, and Hardeman himself was not available for cross-examination. Counsel was particularly concerned that the Hardeman statement revealed that Kennair had been under the influence of "crack" cocaine at the time he said he would go through with the murders.
The trial court denied the defendants' motion for mistrial. The judge reasoned that the defense had been put on notice during the course of preliminary hearings that there was a second confidential informant. The judge further stated that the substance of the Hardeman statement had come out in other testimony offered at trial.
The United States Supreme Court, in United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), established three categories of evidence to which the Brady rule applies, and set forth standards of review in conjunction with these categories. Each involves the discovery after trial, of information previously known to the prosecution but unknown to the defense. The first is the prosecution's knowing use of perjured testimony, or the prosecutor's knowing failure to disclose the fact that testimony used to convict the defendant was false. The second involves cases in which the defendant makes a request for a specific piece of exculpatory evidence. This is exemplified in the facts of the Brady case itself, where defendant Brady had requested the extrajudicial statements made by his accomplice. The third category concerns cases in which the defendant makes a general request for Brady material, or makes no request at all.
The defendant's request appears to fall into the third, or "general request" category. The defense did not make a specific request for Hardeman's statement, or even a more general request for the statements of all confidential informants.
The Agurs court found that there are situations in which evidence is of such substantial value to the defense that elementary fairness requires that the prosecutor disclose it to the defendant even without a specific request. United States v. Agurs, supra, 427 U.S. at 110-12, 96 S.Ct. at 2401. If a general request, or no request at all is made for the exculpatory evidence, a conviction will only be overturned if the omitted evidence creates a reasonable doubt that did not otherwise exist. If there is no reasonable doubt about guilt, regardless of whether or not the additional evidence is considered, there is no justification for a new trial. However, if the verdict is already of questionable validity, additional information of even minor importance might be sufficient to create a reasonable doubt. United States v. Agurs, supra, 427 U.S. at 110-14, 96 S.Ct. at 2401-2; State v. Prudholm, supra, 446 So.2d at 738.
It appears in the instant case that there was not a reasonable doubt as to the *358 existence of a conspiracy. Although the information contained in Hardeman's statement would have, at least to some extent, supported defendants' testimony that they were not serious in their plans to kill Dr. Protti and Dr. Barton, it seems unlikely that it would have created a reasonable doubt where there had been none. We have reviewed the statement and find that, in fact, parts of the statement may have been detrimental to defendant's case. Furthermore, as the trial judge stated, the exculpatory evidence contained in the statement had, for the most part, come out through other evidence produced at trial.
We do not find the state's failure to disclose the statement prior to trial to be a violation of defendant's due process rights under Brady. This assignment of error lacks merit.
In his final argument defendant asserts that the Court erred in failing to suppress physical evidence unconstitutionally and illegally seized from defendant's vehicle. By this assignment defendant Ellis contends that the gun police found in his car at the time of his arrest was seized in violation of his constitutional right against unlawful search and seizure. Defendant argues that the gun was not in plain view when police took it, and the seizure did not, as the state claims, fall under the plain view exception to the warrant requirement. Defendant claims, therefore, that the trial court erred in failing to suppress this evidence.
Although he pled guilty to the charge of being a felon in possession of a firearm, defendant reserved his rights under the holding in State v. Crosby, supra, to contest an illegal search and seizure. At the hearing on Ellis' motion to suppress evidence on December 3, 1993, the state offered testimony from arresting officers Joe Williams and Stephen Rayes. Agent Williams testified that he was part of the surveillance team assigned to monitor James Ellis' activities on the morning of September 28, 1993. He was by this time familiar with the nature of the investigation and with Ellis' criminal record. Other officers involved in the surveillance were Barrett Martin, Steve Cobb, Steve Rayes and Joe Fine. The officers were in unmarked police vehicles.
At about 9:30 a.m., the officers were stationed at various points outside Oakwood Shopping Center in Gretna. When Ellis left the mall's parking lot, Agent Williams followed. He was instructed by Sergeant Monnerjahn via police radio to stop Ellis and place him under arrest for conspiracy to commit murder. Agent Williams and the other officers initially signalled Ellis to stop by using police dashboard lights, sirens and public address equipment. Ellis failed to comply. Williams pulled his vehicle in front of Ellis' car and came to a gradual stop. The other officers stopped alongside and behind Ellis, forcing him to stop.
Agent Williams exited his vehicle, drew his service revolver, and approached Ellis' vehicle from the front. While still two or three yards away from Ellis' car, Williams could see Ellis' left hand on the steering column and his right hand next to his leg. Williams testified that as he stepped closer, he looked through the windshield and saw a .38 caliber handgun on the floorboard of the car directly under Ellis' right leg. Williams was standing less than a foot away from the windshield above the brake tag. By this time the other officers had come to stand next to Ellis' car. Williams told them that Ellis had a gun in the vehicle.
Agent Martin then instructed Ellis to get out of the car and Ellis complied. Martin took Ellis by the arm, positioned him face down on the ground, and placed handcuffs on him. Agent Rayes retrieved the gun, and Williams placed Ellis under arrest.
Agent Rayes testified that during the surveillance he rode with Agent Martin. Rayes further testified that when Agent Williams approached defendant's car, he told Agent Martin he had a "95G"[13], in plain view on the car's floorboard. Rayes then immediately looked into Ellis' car and saw the gun on the floorboard. It was lying in plain view at Ellis' feet; only the tip of the barrel was concealed under the seat. Rayes testified that he took possession of the gun for safety *359 reasons and found the hammer cocked. There was one live round in the chamber.
Susan Guccione, the passenger in Ellis' car, testified at the motion hearing that she had ridden in the car on other occasions and knew that Ellis kept a gun under the front seat. Although she rode as a passenger in the car on the morning of September 28th, the gun was not visible to her. Ms. Guccione also testified that she was absorbed in reading for most of the ride. She testified that when officer Williams approached, he was "right up to the car". She did not hear Williams yell "he's got a gun."
Defendant Ellis testified that when Agent Williams approached his car, the gun was completely under the seat. He kept the gun in his car for protection because he often travelled to dangerous neighborhoods to collect rent on various properties he owned. Ellis testified that Williams approached the car with his gun drawn. Williams told Ellis to get out of the car. Another officer grabbed him and threw him to the ground. He then lay on his stomach on the ground and an officer sat on his head. The officer bounced on Ellis' head and asked if he had a gun in the car. Because he feared injury, Ellis told the officers that he had a gun under the front seat. Ellis testified that he did not give the officers permission to search his car.
At the close of the testimony on December 3rd, Ellis' attorney asked that the judge delay his decision on the motion to suppress the gun. He further requested that defendant's automobile be brought to the courthouse so the judge could view it before ruling on the motion. The judge granted counsel's request.
On December 7, 1993, defendant's car was brought to the judge's parking lot at the Gretna Courthouse Annex. The judge, the attorneys, Agent Williams and various court personnel were present. At issue was the question of whether it was physically possible for Agent Williams to have seen defendant's gun in plain view on September 28th from his vantage point in front of the windshield.
Defense counsel requested that the judge himself view the car. The judge, however, decided that the best evidence would come from Agent Williams. The judge had Agent Williams demonstrate where he stood in relation to the car when he saw the gun. Williams complied. For the record Williams testified that he was standing on the left side of the Ford Crown Victoria, next to the brake tag. His face was about seventeen or eighteen inches from the windshield. Williams testified that from this vantage point he could see the floor of the car.
Investigator Dennis Dunn of the Jefferson Parish District Attorney's Office was asked to sit in the driver's seat of the vehicle to demonstrate the view of the floorboard when the car was occupied. The demonstration was then concluded. At the conclusion of the hearing on December 7th, the court denied defendant's motion to suppress the gun. The court found that the seizure was not unconstitutional because it fell under the plain view exception to the warrant requirement. Counsel lodged a timely objection to the court's ruling.
The United States and Louisiana Constitutions prohibit unreasonable searches and seizures. U.S. Const. Amend. 4; La. Const. Art. I., Sect. 5. It is well established that warrantless searches and seizures are unreasonable per se unless justified by one of the specific exceptions to the warrant requirement. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); State v. Moreno, 619 So.2d 62 (La.1993); State v. Vanderlinder, 575 So.2d 521 (La. App. 5th Cir.1991), writ denied, 580 So.2d 377 (La.1991). The state bears the burden of proving that such an exception applies. State v. Tatum, 466 So.2d 29 (La.1985). The courts have held that the Fourth Amendment does not prohibit the warrantless seizure of evidence in plain view. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); State v. Meichel, 290 So.2d 878 (La.1974). In Coolidge, the United States Supreme Court held that plain view alone is not enough to justify a warrantless search. The court set forth the elements of the "plain view" exception. In order for the warrantless seizure of an object in plain view to be valid, the Coolidge court held, it is an essential predicate that the officer did not *360 violate the Fourth Amendment in entering into the protected area. The court went on to set two additional conditions. First, that it must be readily apparent that the items are evidence or contraband. Second, the discovery of the evidence must be inadvertent. See State v. Fearn, 345 So.2d 468 (La.1977). In Horton v. California, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990), the Supreme Court eliminated the requirement that the discovery be inadvertent.
The evidence educed at the motion hearing shows that the officers met the threshold requirement of the "plain view" doctrine. Both Rayes and Williams testified that they were informed as to defendant's alleged criminal activities, and Williams testified that he was aware that Ellis had been convicted of attempted murder. The officers were advised by Sgt. Monnerjahn to stop defendant and place him under arrest for conspiracy to commit murder. Williams was therefore justified in stopping defendant and approaching the car, at which point he was able to spot the gun.
Because Agent Williams knew defendant to be a convicted felon, he had good reason to believe, without the need of further investigation, that the gun he saw in defendant's car was evidence or contraband. As a convicted felon, defendant was prohibited by law from possessing a firearm. Furthermore, Ellis was known to Agent Williams as a potentially dangerous criminal, and Ellis' hand motions once he stopped his car gave Williams good reason to look inside the car in an effort to see whether Ellis might be reaching for a weapon. We find that the arresting officers satisfied the requirements of a warrantless search under the "plain view" doctrine.
Defendant complains that the trial court should not have allowed Agent Williams' additional testimony concerning his position in relationship to defendant's car. In doing so, defendant argues, the court allowed Williams to alter his original testimony. It appears, from the record, that Williams did not change his testimony, but merely elaborated on it by means of a physical demonstration.
The question of whether evidence was seized in violation of the Fourth Amendment is clearly one for the trier of fact. It is well settled that the factual determinations of the trial judge are entitled to great weight on appellate review. State v. Garriga, 592 So.2d 453 (La.App. 5th Cir. 1991), writ denied, 596 So.2d 553 (La.1992). Accordingly, a trial court's decision to deny a motion to suppress is to be afforded great weight, and it will not be set aside unless the preponderance of the evidence clearly mandates it. State v. Bridges, 610 So.2d 827 (La.App. 4th Cir.1992), on rehearing, 617 So.2d 515 (La.App. 4th Cir.1993), writ granted and remanded, 629 So.2d 1156 (La.1993). Based on the foregoing, this assignment of error is meritless.
Because we find no merit in defendant Ellis' appeal we affirm his convictions and sentences.

ASSIGNMENTS OF ERROR, DEFENDANT KENNAIR
Defendant Wayne Kennair assigns four assignments of error. In his first assignment, he argues that the evidence presented at trial was insufficient to support a conviction on count two of the bill of information. He argues that the state failed to prove an overt act in furtherance of a conspiracy to murder Russel Protti.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. State v. Rosiere, 488 So.2d 965 (La.1986); State v. Honore, 564 So.2d 345 (La.App. 5th Cir. 1990).
First degree murder, as is pertinent to the instant case, is defined as the killing of a human being when the offender has the specific intent to kill or inflict great bodily harm, and has offered, has been offered, has given, or has received anything of value for the killing. LSA-R.S. 14:30(A)(4).
*361 Criminal conspiracy to commit a crime is an inchoate crime separate and distinct from the completed act. State v. Richards, 426 So.2d 1314 (La.1982). The elements of the crime of conspiracy are: (1) an agreement or combination of two or more persons for the specific purpose of committing a crime, plus (2) an act done in furtherance of the object of the agreement or combination. LSA-R.S. 14:26; State v. Mayeaux, supra, 570 So.2d at 192. Proof of a conspiracy may be made with direct or circumstantial evidence. State v. Brown, 398 So.2d 1381.
Specific intent is an essential element of the crime of conspiracy. Specific intent is defined in the law as "... that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1); State v. Mayeaux, supra, at 192. The existence of specific intent is the ultimate conclusion to be decided by the trier of fact. State v. Graham, 420 So.2d 1126 (La.1982).
An "overt act," as an element of conspiracy, need not be an unlawful act. It may be any act, however innocent in itself, accompanying or following the agreement, which is done in furtherance of its object. State v. Richards, supra, at 1317; State v. Mayeaux, supra, at 192. In prosecutions for criminal conspiracy, whether an overt act alleged served to support the object of the conspiracy is a question for the jury. State v. D'Ingianni, 217 La. 945, 47 So.2d 731 (1950). The Louisiana Supreme Court held in D'Ingianni that:
Any act, such as a visit by one of the parties to his co-conspirator for the purpose of discussing details, might suffice as an overt act to complete a criminal conspiracy....

State v. D'Ingianni, 47 So.2d at 733.
In the present case, the state has sufficiently proven the specific intent element of conspiracy. The evidence at trial establishes that Kennair and Ellis entered into an agreement, the object of which was to kill first Leigh Barton, then Russell Protti. Rocky Richard testified that Kennair told him initially that the anonymous solicitor had hired him (Kennair) to kill three individuals; two women and a man. These individuals worked for the school board or some other state entity, and they had been responsible for getting the solicitor fired and imprisoned.
The defendants' own testimony confirmed that Russell Protti was one of the intended victims. Both Kennair and Ellis testified that they talked about Kennair killing Dr. Barton and Dr. Protti in exchange for money, although both defendants denied that they were serious about going through with the plot. It is true that the taped discussions between Rocky Richard and Kennair revealed plans to accomplish the murder of Dr. Barton, but revealed no such plans with regard to Protti. However, it is apparent from the conversation between Kennair and Ellis that the specific plan to kill Protti was only delayed because of Ellis' concern that the murders of these two individuals too close together in time may implicate him. We find no merit in this argument.
In his next assignment of error Kennair contends that the evidence at trial proved only one conspiracy, and that by charging defendant with two counts of conspiracy, the state exposed him to double jeopardy. Both the Louisiana and United States Constitutions prohibit placing a person twice in jeopardy of life or limb for the same offense. United States Constitution Amendment 5; Louisiana Constitution of 1974, Art. 1, § 15. See also LSA-C.Cr.P. art. 591. Double jeopardy provisions protect an accused not only from a second prosecution for the same offense, but also multiple punishments for the same criminal offense. Whalen v. United States, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980); State v. Vaughn, 431 So.2d 763 (La.1983).
Louisiana courts have used two tests in examining violations of double jeopardy. The "distinct fact" test, commonly referred to as the "Blockburger test" is taken from the United States Supreme Court's holding in Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). The court in State v. Knowles, 392 So.2d 651, 654 (La.1980), outlined as follows the Blockburger criteria for examining violations of double jeopardy:

*362 "... the applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not..."
The second test is the "same evidence" test. In State v. Steele, 387 So.2d 1175 (La. 1980), the Louisiana Supreme Court explained that test as follows:
If the evidence required to support a finding of guilt of one crime would also have supported conviction of the other, the two are the same offense under a plea of double jeopardy, and a defendant can be placed in jeopardy for only one. The test depends on the evidence necessary for conviction, not all the evidence introduced at trial ...
The "same evidence" test is somewhat broader in concept than Blockburger the central idea being that one should not be punished (or put in jeopardy) twice for the same course of conduct.

Id. at 1177.
The state's courts, including this Court[14], have recognized and applied both double jeopardy tests, although the Louisiana Supreme Court has in recent years principally relied on the "same evidence" test when evaluating double jeopardy claims. State v. Miller, 571 So.2d 603, 606 (La.1990); State v. Vaughn, supra, State v. Solomon, 379 So.2d 1078 (La.1980); State v. Didier, 262 La. 364, 263 So.2d 322 (La.1972).
Under either test, it does not appear that defendant was subject to double jeopardy. The proof needed to convict Kennair on both counts of conspiracy to commit first degree murder was different in that the alleged victims were different in each count, and the "overt act" in furtherance of the conspiracy might have been different as to each count.
The federal courts have set forth a five-part scheme to be used in determining whether there exists a single conspiracy to commit more than one crime, or multiple conspiracies, sufficiently distinct in their objectives so as not to violate the double jeopardy clause. The elements to be considered are:
(1) the time frame; (2) the locations of the events charged as part of the conspiracy; (3) the persons acting as co-conspirators; (4) the statutory offenses charged in the indictment; and (5) the overt acts or other description of the offense charged that indicate the nature and scope of the activity that the government seeks to punish in the case.
United States v. Ellender, 947 F.2d 748, 759 (5th Cir.1991); (citing United States v. Stricklin, 591 F.2d 1112, 1122 (5th Cir.), cert. denied, 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979)); and United States v. Marable, 578 F.2d 151, 154 (5th Cir.1978). Whether the evidence establishes a single conspiracy or multiple conspiracies is a question of fact for a jury to decide. United States v. Ellender, 947 F.2d at 759; United States v. Erwin, 793 F.2d 656, 662 (5th Cir.), cert. denied, 479 U.S. 991, 107 S.Ct. 589, 93 L.Ed.2d 590 (1986).
In the instant case, the statutory offenses charged in the bill of information were the same. However, the state alleged that the victims were to be killed at different times; Leigh Barton first, then at some time in the future, Russell Protti. The state also alleged that the killings were to take place at different locations. Because Protti was to be killed at a later date, it cannot be known whether individuals other than Ellis and Kennair might have become involved in the plot. Under the five-part test, it appears that the offenses charged by the state were separate and distinct, and thus did not violate the double jeopardy clause. Considering the foregoing, this assignment of error is meritless.
Next, the defendant argues that the trial court erred in finding him a multiple offender within the meaning of La.R.S. 15:529.1 absent proof that the five year cleansing period had not elapsed.
Defendant Kennair was charged in a multiple bill as a fourth felony offender. The *363 most recent predicate offense charged in the bill was a December 18, 1986 burglary conviction for which Kennair was sentenced to serve five years. The offense in the current case occurred between September 4, 1993 and September 28, 1993. Defendant contends that the state did not produce sufficient evidence to prove that the latest predicate offense alleged in the multiple offender bill of information fell within the five year "cleansing" period set forth in LSA-R.S. 15:529.1 as it existed at the time of the filing of the multiple bill.[15]
To prove that a defendant is a multiple offender, the state must establish, by competent evidence, the prior felony convictions and that the defendant is the same person who was convicted of the prior felonies. State v. Metoyer, 612 So.2d 755 (La. App. 5th Cir.1992); State v. Chaney, 423 So.2d 1092 (La.1982). The state bears the additional burden of showing that the predicate convictions fall within the five year cleansing period. Evidence of the date of discharge for the prior sentence is therefore an essential element of the habitual offender case. State v. Metoyer, supra, 612 So.2d at 758.
As the state has conceded in its brief to this Court, the defendant would have been released from state custody on his 1986 conviction no later than December 18, 1991, and therefore the predicate does not fall within five years of commission of the principal offense. Considering the foregoing, the defendant's sentence is vacated, and the case remanded to the trial court for resentencing.
Also assigned as error are any and all errors patent on the face of the record.
We have conducted such a review of the record herein and find errors in defendant Kennair's sentencing as a multiple offender. Because we have vacated the sentence, we pretermit any discussion of those errors.
For the above stated reasons, we affirm the convictions and sentences of defendant, Ellis. We further affirm the convictions of defendant Kennair. We vacate the multiple offender sentence of Kennair.
CONVICTIONS AND SENTENCES AFFIRMED AS TO ELLIS; CONVICTIONS AFFIRMED, SENTENCE VACATED AND REMANDED AS TO KENNAIR.
NOTES
[1] Defendant, Ellis, has not challenged the plea or sentence in the conviction for being a convicted felon in possession of a firearm.
[2] Mr. Richard testified at trial that he had a criminal record which included convictions for simple kidnapping, simple rape, simple robbery, cocaine possession and armed robbery.
[3] A pin register is a device that records the dates and times calls are made to or from the monitored telephone. It also records the phone numbers called from the monitored telephone and the telephone numbers of incoming calls. Actual communications cannot be recorded by a pin register.
[4] Richard does not know how to read, and was therefore unable to discern for himself what was written on the paper.
[5] The state presented rebuttal testimony from Reginald Williams, an employee of the Jefferson Parish School Board. Mr. Williams testified that through a conversation he had with Ellis' friend Roland Lassere, he learned that the reason Ellis' gun did not fire on May 16, 1990 was that the towel in which it was wrapped became caught between the hammer and the firing pin.
[6] La.C.E. art. 801(D)(3)(b) provides:

A statement is not hearsay if ... [t]he statement is offered against a party, and the statement is ... [a] statement by a declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of the conspiracy, provided that a prima facie case of conspiracy has been established.
[7] LSA-R.S. 15:455 formerly read as follows:

Each coconspirator is deemed to assent to or to commend whatever is said or done in furtherance of the common enterprise, and it is therefore of no moment that such act was done or such declaration was made out of the presence of the conspirator sought to be bound thereby, or whether the conspirator doing such act or making such declaration be or be not on trial with his codefendant. But to have this effect a prima facie case of conspiracy must have been established.
On January 1, 1989, R.S. 15:455 was amended. Also on that date the Louisiana Code of Evidence was enacted. La.C.E. art. 801(D)(3)(b) now encompasses the essence of the old 15:455.
[8] La.C.E. art. 104(A) provides:

Preliminary questions concerning the competency or qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of Paragraph B. In making its determination it is not bound by the rules of evidence except those with respect to privileges.
[9] La.R.S. 14:26(A) provides:

Criminal conspiracy is the agreement or combination of two or more persons for the specific purpose of committing any crime; provided that an agreement or combination to commit a crime shall not amount to a criminal conspiracy unless, in addition to such agreement or combination, one or more of such parties does an act in furtherance of the object of the agreement or combination.
[10] Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
[11] Particular acts, vices, or courses of conduct of a witness may not be inquired into or proved by extrinsic evidence for the purpose of attacking his character for truthfulness, other than conviction of crime as provided in Articles 609 and 609.1 or as constitutionally required.
[12] At the time of trial Mr. Hardeman was incarcerated in St. Bernard Parish on a charge unrelated to this case.
[13] 95G is a police code meaning a concealed weapon, specifically, a gun.
[14] See State v. Head, 598 So.2d 1202 (La.App. 5th Cir.1992).
[15] LSA-R.S. 15:529.1(C), before its amendment in 1994, established the five-year cleansing period as follows:

This section shall not be applicable in cases where more than five years have elapsed since the expiration of the maximum sentence, or sentences, of the previous conviction, or convictions, and the time of the commission of the last felony for which he has been convicted. In computing the period of time as provided herein, any period of servitude by a person in a penal institution, within or without the state, shall not be included in the computation of any of the said five years.