STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

13-218

STATE OF LOUISIANA

VERSUS

ALBERT L. ARNOLD

**********

APPEAL FROM THE
TWENTY-EIGHTH JUDICIAL DISTRICT COURT
PARISH OF LASALLE, NO. 95771
HONORABLE J. CHRISTOPHER PETERS, DISTRICT JUDGE

**********

SHANNON J. GREMILLION
JUDGE

**********

Court composed of James T. Genovese, Shannon J. Gremillion, and John E. Conery, Judges.

AFFIRMED.

Annette Fuller Roach
Louisiana Appellate Project
P. O. Box 1747
Lake Charles, LA 70602-1747
(337) 436-2900
COUNSEL FOR DEFENDANT/APPELLANT:
    Albert L. Arnold

**J. Reed Walters**
**District Attorney–Twenty-Eighth Judicial District Court**
**P. O. Box 1940**
**Jena, LA 71342**
**(318) 992-8282**
**COUNSEL FOR APPELLEE:**
　　**State of Louisiana**

**GREMILLION, Judge.**

Defendant, Albert L. Arnold, was convicted of manufacturing methamphetamine and conspiracy to manufacture methamphetamine after police executed a search warrant at his residence and found items that are used to manufacture methamphetamine, the remnants of two methamphetamine cooks, residue of methamphetamine in Defendant's bedroom, and methamphetamine that had been in the possession of Defendant's son, Joshua Arnold.

Defendant was charged by bill of information with one count of manufacturing of methamphetamine, a violation of La.R.S. 40:967, and one count of conspiracy to manufacture methamphetamine, a violation of La.R.S. 14:26 and La.R.S. 40:967. Defendant was tried by a jury and convicted as charged.

Defendant was sentenced to serve twenty-two years at hard labor for manufacturing methamphetamine, with the first ten years of the sentence to be served without benefit of probation, parole, or suspension of sentence, and to eight years at hard labor for conspiracy to manufacture methamphetamine. The trial court ordered the sentences to run concurrently but consecutively to the sentence Defendant was then serving. A motion to reconsider sentence was denied.

Defendant now appeals and asserts the following four assignments of error: 1) The evidence was insufficient to prove beyond a reasonable doubt that he manufactured methamphetamine; 2) The evidence was insufficient to prove he conspired with Joshua Arnold and Matilda Holmes to manufacture methamphetamine; 3) The trial court erred in permitting the prosecution to introduce several items of evidence during trial which were directly connected to another individual who was not on trial; and 4) The trial court failed to sufficiently

consider and weigh the factors set forth in La.Code Crim.P. art. 894.1, resulting in the imposition of excessive sentences.

## ASSIGNMENTS OF ERROR NUMBERS ONE AND TWO

In his first assignment of error, Defendant contends that the evidence, when viewed under the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979), standard, was insufficient to prove beyond a reasonable doubt that he manufactured methamphetamine on or about December 21, 2011. In his second assignment of error, Defendant contends that the evidence, when viewed under the *Jackson* standard, was insufficient to prove beyond a reasonable doubt that he conspired with Joshua Arnold and Matilda Holmes to manufacture methamphetamine on or about December 21, 2011.

> In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier-of-fact that all of the elements of the crime have been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Captville*, 448 So.2d 676, 678 (La.1984). Additionally, when circumstantial evidence forms the basis of the conviction, the evidence, "assuming every fact to be proved that the evidence tends to prove . . . must exclude every reasonable hypothesis of innocence." La.Rev.Stat. 15:438; *see State v. Jacobs*, 504 So.2d 817, 820 (La.1987)(all direct and circumstantial evidence must meet the *Jackson v. Virginia* test); *State v. Porretto*, 468 So.2d 1142, 1146 (La.1985) (La.Rev.Stat. 15:438 serves as an evidentiary guide for the jury when considering circumstantial evidence).

*State v. Sosa*, 05-213, pp. 6-7 (La. 1/19/06), 921 So.2d 94, 99.

Defendant was convicted of manufacturing methamphetamine, a violation of La.R.S. 40:967 (footnotes omitted), which states, in pertinent part:

> **A. Manufacture; distribution.** Except as authorized by this Part or by Part VII-B of Chapter 5 of Title 40 of the Louisiana Revised Statutes of 1950, it shall be unlawful for any person knowingly or intentionally:

2

(1) To produce, manufacture, distribute, or dispense or possess with intent to produce, manufacture, distribute, or dispense, a controlled dangerous substance or controlled substance analogue classified in Schedule II [.]

In *State v. Bernard*, 441 So.2d 817, 820 (La.App. 3 Cir. 1983), *writ denied*, 445 So.2d 439 (La.1984), this court held: "In spite of the words that 'it shall be unlawful for any person knowingly or intentionally . . .' to do the prohibited acts, the statute requires no more than general criminal intent. LSA-R.S. 14:11; *State v. Banks*, 307 So.2d 594 (La.1975)."

> [G]eneral criminal intent is . . . present "when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act." La.Rev.Stat. § 14:10(2). "In general intent crimes, criminal intent necessary to sustain a conviction is shown by the very doing of the acts which have been declared criminal." *State v. Holmes*, 388 So.2d 722, 727 (La.1980).

*State v. Oliphant*, 12-1176, pp. 11-12 (La. 3/19/13), 113 So.3d 165, 172.

Defendant was also convicted of conspiracy to manufacture methamphetamine. Criminal conspiracy is defined as follows:

> Criminal conspiracy is the agreement or combination of two or more persons for the specific purpose of committing any crime; provided that an agreement or combination to commit a crime shall not amount to a criminal conspiracy unless, in addition to such agreement or combination, one or more of such parties does an act in furtherance of the object of the agreement or combination.

La.R.S. 14:26(A). In *State v. Smith*, 07-847, p. 3 (La.App. 3 Cir. 1/30/08), 974 So.2d 881, 884, we stated:

> In the instant case, the State had the burden of proving, beyond a reasonable doubt, that the Defendant conspired to manufacture methamphetamine and that either the Defendant or the co-conspirator acted in furtherance of manufacturing methamphetamine. Additionally, as noted in *State v. Zeno*, 99-69, pp. 6-7 (La.App. 5 Cir. 8/31/99), 742 So.2d 699, 704-05:

> Specific intent is an essential element of conspiracy. *State v. Ellis*, 94-599 (La.App. 5 Cir.5/30/95), 657 So.2d 341, 361, *writs denied*, 95-2095 (La.12/8/95), 664 So.2d 421 and 95-1639 (La.1/5/96), 666 So.2d 300. Specific intent is defined as ". . . that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). The determination of specific criminal intent is a question of fact and may be inferred from circumstances and actions of the defendant. *State v. Armant*, 97-1256 La.App. 5 Cir.5/27/98), 719 So.2d 510, 517, *writs denied*, 98-1884 (La.11/20/98), 729 So.2d 3 and 98-1909 (La.11/20/98), 729 So.2d 4. Proof of a conspiracy may be made by direct or circumstantial evidence. *State v. Ellis*, *supra*.

Detective Leland Guin testified that he obtained a search warrant for Defendant's residence on December 21, 2011, as the result of a tip from a reliable informant. Police executed the warrant and entered the residence through an unlocked door and found that no one was at home. During the search, Detective Guin received word from the informant that the occupants were returning. Defendant, Joshua, Patrick Shipley, Holmes, Deborah Arnold, and an infant entered the residence through the back door. As soon as police announced their presence, Joshua, Patrick, and Matilda exited the front door and ran across a field. The three were caught, handcuffed, returned to the residence, and patted down. Detective Guin found a syringe in Shipley's back pocket. Detective Guin testified that Defendant, Joshua, and Holmes lived at the residence.

Detective Guin spoke with Joshua inside the residence, and Joshua agreed to cooperate. Joshua then led Detective Guin through the residence, pointing out items that police had not yet found. Joshua subsequently took Detective Guin to the field to which he had previously fled and pointed out where he had dropped

4

several items, including a prescription bottle that contained suspected methamphetamine.

Detective Guin testified that Joshua showed him a butter bowl containing fertilizer in the garage; a bottle of Liquid Fire in the utility room; a plastic bag containing hypodermic syringes hidden under a drawer in a storage room; a Coleman lantern fuel in the garage; a plastic bottle containing the remnants of a methamphetamine cook behind Joshua's bed; coffee filters containing a white substance suspected of being binding material, pseudoephedrine, or methamphetamine in a trash bag in Joshua's room; a glass Tostitos salsa jar containing caustic soda in a bathroom cabinet; and a Dr. Pepper bottle containing remnants of a prior methamphetamine cook in a trash bag on a covered walkway between the residence and the garage.

Detective Guin testified that a plastic bottle was the lab itself; the Dr. Pepper bottle found by police contained lithium batteries that had been broken open, and lithium strips were commonly used in the cooking of methamphetamine; Coleman lantern fuel was used as a catalyst agent in the process; Liquid Fire and caustic soda also played roles in the manufacturing of methamphetamine; and coffee filters were used to strain substances from the liquid produced by a methamphetamine cook. Detective Guin further testified that syringes were used for the distribution of methamphetamine.

A blue box found inside a chest of drawers in Defendant's bedroom contained hypodermic needles; razor blades; straws; a shoe lace; tin foil; a spoon, which police thought contained methamphetamine residue; a couple of rags; and a pouch. Detective Guin testified that tin foil and spoons were commonly used for the consumption or distribution of methamphetamine.

5

A leather pouch containing drug paraphernalia and suspected methamphetamine were found in the chest of drawers in Joshua's room. Police also found a box of sandwich bags, some Zig-Zag rolling papers, a straw, plastic tubing, and a set of digital gram scales in Joshua's room. Detective Guin testified these items were commonly used in the distribution and consumption of methamphetamine.

Detective Guin spoke to Defendant at the residence and recorded a portion of that conversation. During the conversation, Defendant told Detective Guin he owned the blue box found in his bedroom and what it contained. During the interview, Defendant stated, "I couldn't tell you who's out there doing anything." Detective Guin then told Defendant that Defendant "knew that this cooking and stuff was going on, and you participated in the cooks, you know, because you have a problem. Am I right or wrong on this?" Defendant responded, "You're right about it. Yeah, maybe I've got a problem, and I let it go, and I know, yeah, yeah, I know it happened." Police then stated, "You guys have been cooking meth. I don't know how long you started after you got out, but I know it's been going on for at least two and a half months." Defendant responded, "Yeah." Detective Guin then asked, "Am I right on that?" Defendant replied, "Pretty close." Defendant then admitted that the items found in his room belonged to him.

Portions of Detective Guin's testimony were corroborated by Deputy Billy Prince, who participated in the execution the search warrant.

Rachel Plaisance, an employee of the North Louisiana Crime Lab, tested items submitted to the lab by police. Plaisance testified that a spoon found in Defendant's bedroom contained methamphetamine and ephedrine. Plaisance also testified that the white residue on a piece of plastic linked to Joshua tested positive

for methamphetamine. Plaisance further testified that the prescription bottle submitted to the lab by police contained methamphetamine and ephedrine.

Alex King, who was also an employee of the North Louisiana Crime Lab, was questioned regarding methamphetamine laboratories. King indicated that all that was needed to manufacture methamphetamine was ammonia, pseudoephedrine, a solvent, and lithium, which could be obtained from breaking open lithium batteries. King testified that ephedrine was the base compound for manufacturing methamphetamine. Fertilizer pellets provided the ammonia necessary for the chemical reaction needed to start the reduction. Liquid Fire was used at the end of the process to make a gas generator, as Liquid Fire was mixed with rock salt to produce HCL gas vapors which "precipitate crystals . . . out of the solution." Coleman camp fuel was a solvent that could be used to extract ephedrine out of the tablets used or as part of the process "when you throw everything together." King testified "[t]his will form the liquid layer that I was talking about earlier where you precipitate crystals out." Caustic soda could be used in a two-layer solution to manufacture methamphetamine.

King identified a photograph depicting a "disformed" bottle containing a few pellets and pieces of paper that looked like coffee filters. However, King testified that the most important fact was the lithium and the battery being cracked open. King was then shown State's Exhibit 13, a photograph of the bottle found in Joshua's room. King stated that the bottle in the photograph was discolored and contained pellets, cut up pieces of lithium metal strips, and a liquid layer. King further testified:

> I think what's most important to take away for me, and I like to tell people, is that, all of these things you probably have laying around the house at any one time. It's how they are, they all, where they are,

how their being, in the area that they are. You have to put it all together and ask yourself why is it like this. Even though all of this stuff can be readily available in all of our homes at one time, why are all these ingredients like this in the form that they're in?

. . . .

One of those reasons would be to manufacture methamphetamine.

When asked if there was any other reason for the items to be in the condition they were in, King responded: "I can't think of any reason why the camera batteries would be like that. I can't think of any reason why that bottle would have all that in there like it is."

Defendant notes that he was not charged with operation of a clandestine laboratory, which makes it illegal to possess compounds or supplies with the intent that those items be used to manufacture a controlled dangerous substance. Defendant also notes there was no testimony that there was an active lab at his residence when the search warrant was executed.

Defendant contends that the mere presence of syringes, caustic soda, Liquid Fire, fertilizer, and Coleman lantern fuel at his residence did not put him on notice that Joshua was cooking methamphetamine, and the possession of these items without an active lab is insufficient to prove the elements of manufacturing methamphetamine.

Defendant contends that his admission that he was a methamphetamine user did not equate to an admission of manufacturing methamphetamine or conspiring to do so. Defendant argues that Detective Guin's interrogation did not clarify who was cooking methamphetamine, the extent of the Defendant's involvement therewith, or whether Defendant had used any of the methamphetamine Joshua cooked.

8

Defendant contends there was no evidence that he personally cooked methamphetamine, participated in a methamphetamine cook with Joshua, or purchased any of the items seized by police as ingredients for manufacturing methamphetamine. Defendant notes that Joshua led detectives through the residence, had possession of methamphetamine when he arrived at the residence, and the remnants of a methamphetamine cook were found behind Joshua's bed. Defendant asserts that his mere presence is not sufficient to support a conviction for manufacturing methamphetamine.

Defendant argues that failure to act when one knows or has reason to know another is committing a crime is insufficient to uphold a conviction for conspiracy. Further, silence about illegal activity is insufficient. Defendant contends that there must be an agreement to commit the crime of conspiracy, and, at least one of the persons must do an act in furtherance of committing the crime. Defendant argues that the State failed to introduce any evidence that there was an agreement between himself and another to manufacture methamphetamine.

There need not be an active lab at Defendant's residence in order to find him guilty of manufacturing methamphetamine. *See State v. Shumaker*, 41,547, (La.App. 2 Cir. 12/13/06), 945 So.2d 277, *writ denied*, 07-144 (La. 9/28/07), 964 So.2d 351.

In viewing the evidence in the light most favorable to the State, the jury could have determined that Defendant participated in the manufacture of methamphetamine based on his remarks when questioned by Detective Guin. Based on Defendant's remarks and the evidence of two prior methamphetamine cooks at his residence, Defendant's conviction for manufacturing methamphetamine is affirmed.

Furthermore, the circumstantial evidence presented by the State was sufficient for the jury to infer that Defendant entered into an agreement with Joshua to manufacture methamphetamine, and there was an act in furtherance of the agreement. Defendant admitted that he took part in manufacturing methamphetamine and that he used methamphetamine. Joshua had methamphetamine on his person when he arrived at the residence, and he knew where items involved in the manufacture of methamphetamine were located inside the residence where he and Defendant resided. In fact, Joshua had the remnants of a methamphetamine cook behind his bed, and there were more remnants of a methamphetamine cook in a garbage bag outside of Defendant's residence.

Accordingly, we affirm Defendant's convictions.

## ASSIGNMENT OF ERROR NUMBER THREE

In his third assignment of error, Defendant contends that the trial court erred in permitting the State to introduce several items of evidence during the trial which were directly connected to another individual who was not on trial.

At trial, defense counsel objected to the admission of photographs of the prescription bottle Joshua discarded and the bottle's contents. The trial court found that the evidence was relevant to both the charge of manufacturing methamphetamine and conspiracy to manufacture methamphetamine.

Defense counsel later objected to the admission of photographs of a leather pouch and its contents, which included a photograph that depicted a box of plastic sandwich bags, some Zig-Zag rolling papers, a straw, plastic tubing, a digital gram scale, and a plastic bottle that appeared to contain the remnants of a methamphetamine cook. Finally, Defendant disputes the admission of a

photograph depicting a prescription bottle. Defense counsel also objected to the admission of the actual items depicted in the above described photos.

Defendant contends that the evidence was connected to Joshua, and Joshua was not tried with Defendant. Thus, evidence found in Joshua's room or that disposed of by him should not have been introduced at Defendant's trial. Defendant argues that the evidence at issue did not show that he exercised control or possession of those items. Defendant also argues that the State failed to prove that he was aware of the various evidence located in Joshua's room or on his person at the time they arrived back at the residence. Defendant further argues that, because the State failed to connect him to the items, other than its broad conspiracy theory, the items were not relevant and were inadmissible at his trial. Defendant contends that the State failed to show that a conspiracy existed and that the evidence found in Joshua's room and under his control did not make the existence of any fact of consequence to the determination of Defendant's guilt more probable or less probable than it would without the evidence. Defendant further contends that, if the evidence at issue was relevant, its prejudicial effect outweighed its probative value, as the evidence confused or misled the jury.

In *State v. Evins*, 626 So.2d 480 (La.App. 3 Cir. 1993), the defendant was convicted of manufacturing crack cocaine, possession with intent to distribute cocaine, conspiracy to manufacture cocaine, and possession of drug paraphernalia. Evidence produced at trial indicated the following:

> Paul Evins, the defendant, was operating a drug trafficking business in Oakdale, Allen Parish, Louisiana. Evins would purchase cocaine in powder form in Houston, Texas, either personally or through his agent, Mark Clemmons. The cocaine in powder form would be brought back to Oakdale and would be cooked into "crack" cocaine either by Evins or his agent. The "crack" cocaine was for local distribution. Money for and from the operation was held for

11

Evins in the home of and/or in bank safety deposit boxes by his sister, Sally Moreaux.

*Id.* at 483.

The defendant was charged with conspiring with Mark Clemmons, Ricky Hines, Michael Randolph, and Sally Moreaux, in the production, manufacture, distribution, or dispensing of crack cocaine. Testimony adduced at trial indicated that Randolph was the sentry stationed at the trailer's door to warn of the appearance of the police while cocaine was being cooked into crack form inside the trailer. Clemmons, Hines, and the defendant were inside the trailer. One or all of the men were in the process of cooking the cocaine at the time the police arrived as evidenced by the fact that a cookie of crack cocaine was still bubbling in one of the microwaves in the trailer when the police entered.

According to the testimony at trial, the crack cocaine found was, at least, the second batch of cocaine brought into the Oakdale area by the defendant or Clemmons from Houston, Texas, by the defendant in a ten-day period. The street value of the second batch of crack cocaine was over $100,000.00. No large sums of money were found at the trailer or the defendant's residence. However, in searching the defendant's residence, police found receipts and other documents indicating the defendant's money was being held for him by his sister, Moreaux.

Execution of a search warrant revealed $30,300.00 in a bank safety deposit box registered to Moreaux and her sister wrapped in a manner commonly used by drug dealers and another $5,000.00 in a boot in Moreaux's home also wrapped in a manner commonly used by drug dealers. All of this information was presented at trial to prove that a single criminal conspiracy to produce, manufacture, distribute, or dispense crack cocaine existed by and between the defendant, Moreaux, Hines,

Clemmons, and Randolph and to show that the role played by each was vital to its existence and perpetuation of the drug business.

On appeal, the defendant argued the trial court improperly allowed evidence of other crimes into evidence without first conducting a *Prieur* hearing. In addressing the issue, this court stated:

> Consequently, all of the evidence adduced at trial was either evidence of the other three individual crimes with which Evins was charged or of the criminal conspiracy involving not only Evins but also Moreaux, Clemmons, Hines, and Randolph. Thus, there was no evidence of "other crimes" presented at the trial necessitating the requirement for a *Prieur* notice or *Prieur* hearing.

*Id.* at 488.

The defendant also argued that the trial court erred in allowing evidence that was obtained as a result of the search of a safety deposit box registered to Moreaux and her sister as well as the search of Moreaux's residence, claiming the evidence was irrelevant and highly prejudicial. This court discussed the issue as follows:

> [T]his evidence was both relevant and material to prove the existence of a conspiracy between the defendant and his sister, Sally Moreaux, to produce, manufacture or dispense a CDS. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." LSA–C.E. art. 401. However, relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." LSA–C.E. art. 403.
>
> In the instant case, this evidence was necessary to show the existence of the conspiracy between the defendant and Sally Moreaux. Consequently, this evidence was relevant. Furthermore, it took very little time to present this evidence to the jury. The evidence was not complicated, nor does it appear too difficult for the jury to comprehend. Additionally, there was nothing inflammatory in showing pictures of money, even in light of the fact that it was a large sum ($30,000.00), when the introduction of "crack" cocaine in excess of $100,000.00 had previously been introduced.

13

It is the responsibility of the trial court to exercise reasonable control over the presentation of the evidence. The trial judge is left with wide discretion as to the admissibility of evidence under pertinent evidence rules. Furthermore, the decision of the trial judge will not be overturned absent a clear abuse of discretion. See *State v. Clay*, 576 So.2d 1099 (La.App. 3d Cir.), writ denied, 580 So.2d 669 (La.1991). There is no showing of an abuse of discretion on the part of the trial judge.

*Id.* at 496.

In the instant case, the items found in Joshua's room and on his person when police arrived were relevant to prove the conspiracy. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." La.Code Evid. art. 403. A trial court's ruling as to relevancy will not be disturbed absent a clear abuse of discretion.

The evidence at issue was both probative and prejudicial. Thus, it is the trial court's duty to balance those two competing concepts and make the call regarding admissibility. We find no abuse its discretion in the trial court's determination.

**ASSIGNMENT OF ERROR NUMBER FOUR**

In his fourth assignment of error, Defendant contends that the trial court failed to sufficiently consider and weigh the factors set forth in La.Code Crim.P. art. 894.1 resulting in the imposition of excessive sentences.

The law is well settled concerning the standard to be used in reviewing excessive sentence claims:

La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a

14

> needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95–2784 (La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

*State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331.

Defendant was convicted of manufacturing methamphetamine, which is punishable by a term of imprisonment of ten to thirty years, with at least the first ten years of the sentence to be served without benefit of probation, parole, or suspension of sentence. La.R.S. 40:967. Defendant was also convicted of conspiracy to manufacture methamphetamine, which is punishable by a term of imprisonment of ten to thirty years pursuant to La.R.S. 40:967 and La.R.S. 14:26(B), or up to fifteen years pursuant to La.R.S. 40:967 and La.R.S. 14:26(C), or up to fifteen years pursuant to La.R.S. 40:979(A). The State has the authority to charge Defendant under La.R.S. 14:26 or La.R.S. 40:979. *See State v. O'Blanc*, 346 So.2d 686, 690 (La.1977). The State charged Defendant pursuant to La.R.S. 14:26 but did not note the subsection under which he was charged. However, Defendant's sentences of twenty-two years hard labor, ten years of which were to be served without benefits, and eight years at hard labor fall within the statutory sentencing ranges.

Prior to imposition of Defendant's sentences, the trial court stated the following:

> The pre-sentence investigative report provides to me that you are a 58 year old male. You are a four time felony offender. Your

15

record reflects that you were convicted in Winn Parish for the crime of Simple Burglary after it had been reduced from Aggravated Burglary in May of 1980. Your sentence was deferred at that time and you were placed on 5 years of active supervised probation. Subsequently in May of 2008, you pled guilty to the charge of issuing worthless checks which was felony grade and you were sentenced to two years of hard labor which was suspended and placed on two years active supervised probation. However, the record reflects that probation was revoked in November, 2009. In June of 2010, you pled guilty to the Operation of a Clandestine Lab and Conspiracy to Operate a Clandestine Lab. For those crimes you were sentenced as a part of plea bargain arrangement with the state to serve 5 years at hard labor with 3 of those years being suspended. Additionally you were placed on 5 years active supervised probation upon your release. The probated sentence was subsequently revoked on the basis of the arrest on these charges in which you entered an admission to the probation revocation. Then approximately 4 months after you began supervision on the last charges, the last sentence, you were arrested on the instant charges. Your continued criminal history is certainly not indicative of a person who simply just made a mistake. This a criminal activity that has lasted over 30 years. 1980 until now, that's 32 years. The pre-sentence investigative report is unremarkable as it pertains to your social history. It reflects that you come from a normal size family by today's standards, having 2 sisters. However, your immediate family is seemingly a mess right now. You're currently divorced form [sic] Debbie Arnold but you are still residing with her. Further you have 3 children, namely Jessica, Jennifer and Joshua. No information was provided to me regarding Jessica. However, I can see that Meth creation and distribution certainly didn't stop at your generation as Jennifer is currently serving 3 consecutive 5 year sentences for Distribution of Methamphetamines. Further, Joshua as you know is a co-defendant with you and pled guilty to Manufacture of Methamphetamines last month as well. You are a poster child for creating a bad role model for your children as they have obviously followed in your lead as to resorting to drugs to make a living or to make life easier upon themselves. Finally, your work history shows that you can be a productive member of society if you should so choose as you have held employment in numerous jobs over the years ranging from the oilfield, to a truck driver, to a self employed [sic] mechanic at the time of your arrest. Your record shows that you do not claim a disability nor have you ever served in the military. The most disturbing information in your social history is the recitation of your drug use. You stated in that report that you had used illegal drugs since you were 14 years old. For over 40 years you have used several illicit drugs including speed and occasionally marijuana. However, your drug of choice per your own statement was methamphetamines. I've heard it said that drug cases are victimless crimes. I have even heard it said that punishing meth heads should be lower on the punishing scale because those guys making meth are just supporting

their family or simply just addicted. It's not their fault that they are in the position in which they are in. I certainly couldn't disagree more. The crime for which you have been convicted is one of the most reprehensible crimes in our society. The stuff that you are making ruins lives, not only for the people that are using your product but for the people that care for them. Further, there is no evidence that the product was solely meant for you or whether or not it was going to others. By the fact that you had several people involved in your arrest including your son, I can only assume that it was to be distributed generously to others. You didn't care. Because the nature of your offense and the multiple occurrences of selling methamhetamines [sic] and making methamphetamines, I find that your actions have become a pattern of conduct that must be broken. If you are given a suspended sentence or put on probation, there's an undue risk to society that you would continue to commit further drug related offenses. This determination is bolstered by the fact that you are not out of prison 4 months before you were making meth again and were arrested for basically the same offense for which you actually served time. Further, given the serious nature of the offenses that you are now convicted of, I believe that your [sic] in need of correctional treatment that can be provided most effectively by the commitment to an institution. Manufacture of Methamphetamine and Conspiracy to Manufacture Methamphetamines are serious offenses and should not be treated lightly. These are charges that prey on the weaknesses of others. You request treatment for your addiction and that I give you some drug treatment and I not lock you up and throw away the key, that is your exact quote. I agree. That simply warehousing you in a facility without providing you some assistance is not a wise use of the state's resources or your resources. If you are ever able to obtain your freedom you should have at least have some tools in order to participate in a free society. However, such drug treatment will occur in a facility. To let you out on the streets at this time is simply giving you authority to keep making meth with impunity. You have started a cycle starting with you and continuing through your kids. We're going to stop that cycle today. No other members of your family nor of our society will be subject to this influence for a very long time. Therefore I believe that a lesser sentence would deprecate the seriousness of the offense charged. As indicated earlier, as a part of the pre-sentence investigative report that I was provided, I was given the information that you are 58 years of age and have an educational background of completion of the tenth grade. Even though I was provided with information as to your family, I have no information as to the extent they rely upon you for support or even if they still reside in LaSalle Parish. The report indicates that you have held intermittent employment and even ran your own mechanic shop for a while. I have no idea of the profitability of that business or how much money was legitimately made. Accordingly, in light of my review of the pre-sentence investigative report and the consideration of the factors

17

contained in 894.1, (A)1 through 3 of the Louisiana Code of Criminal Procedure. . . .

Defendant contends that his sentences are excessive because no recognizable quantity of methamphetamine was manufactured, produced, distributed, dispensed, or possessed. Defendant also contends that the legislature created the offense of creation or operation of a clandestine laboratory to cover the purchase or transportation of various components or materials with the intent to manufacture a controlled dangerous substance, which is what the evidence in the case at bar reflects. The penalty range for creation or operation of a clandestine laboratory is five to fifteen years with a maximum fine of up to $25,000.000. La.R.S. 40:983. Defendant notes that his sentences exceed the maximum set forth for a violation of La.R.S. 40:983.

In *State v. Lingefelt*, 38,038 (La.App. 2 Cir. 1/28/04), 865 So.2d 280, *writ denied*, 04-597 (La. 9/24/04), 882 So.2d 1165, the defendant was sentenced to serve twenty-two years at hard labor without benefits and ordered to pay a $50,000.00 fine for manufacturing methamphetamine and ten years at hard labor for conspiracy to manufacture methamphetamine. Five years of the sentence for conspiracy was to run consecutively with the sentence for manufacturing methamphetamine. At the time of sentencing, the trial court noted that the defendant was fifty-one years old; had convictions for reckless operation of a vehicle, speeding, resisting an officer, disturbing the peace, hit and run, simple burglary and DWI; his probation on the simple burglary had been revoked when the defendant was convicted of possession of marijuana with intent to distribute; he had a GED and a small engine certificate; he worked for a tree service and a gas station; he had seven adult children; he had been manufacturing methamphetamine

18

for approximately twenty years; he involved his family in the drug business; two of the defendant's sons had pled guilty to drug charges in connection with the case; there was a high probability that he would commit another crime if granted probation; he was in need of lengthy correctional treatment in a custodial environment; a lesser sentence would deprecate the seriousness of the offense; he had been persistently involved in criminal activity; he was a leader and organizer of his family and other young people in conspiring to manufacture and in manufacturing methamphetamine; and he had made money from his ongoing drug activities. On appeal, the second circuit affirmed the defendant's sentences.

In the case at bar, the trial court thoroughly considered Defendant's background and the nature of the offenses when imposing the sentences at issue. Based on the nature of the offenses, Defendant's status as a fourth offender, the legislative purpose behind the punishment, and a comparison of the sentence imposed in *Lingefelt*, 865 So.2d 280, we find the trial court did not abuse its discretion when imposing the sentences at issue.

## DECREE

Defendant's convictions and sentences are affirmed.

**AFFIRMED**.